IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2016 Session

**KIMBERLY E. LAPINSKY v. JANICE E. COOK, ET AL.**

**Appeal from the Chancery Court for Sevier County**
**No. 14-1-005     Telford E. Forgety, Jr., Chancellor**

---

**No. E2015-00735-COA-R3-CV-FILED-SEPTEMBER 26, 2016**

---

Kimberly E. Lapinsky ("Plaintiff") appeals the order of the Chancery Court for Sevier County ("the Trial Court") granting summary judgment to Janice E. Cook, Kevin D. Cook ("the Cooks") and Brenda Brewster ("Brewster") in this lawsuit that arose from the sale of a house by the Cooks to Plaintiff.  Plaintiff raises issues on appeal with regard to whether the Trial Court erred in granting summary judgment and whether the Trial Court erred in failing to allow Plaintiff to conduct additional discovery prior to ruling on the motions for summary judgment.  The Cooks raise an issue regarding whether the Trial Court erred in denying their motion for attorney's fees pursuant to Tenn. Code Ann. § 47-18-109.  We find and hold that the Trial Court did not abuse its discretion in refusing to allow further discovery, that the defendants made properly supported motions for summary judgment, and that Plaintiff failed to show that there is a genuine disputed issue of material fact.  As the Cooks and Brewster made properly supported motions for summary judgment and are entitled to summary judgment, we affirm the grants of summary judgment.  We further find and hold that the Trial Court did not abuse its discretion in denying the motion for attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J.W.S. and JOHN W. MCCLARTY, J., joined.

Douglas E. Taylor, Seymour, Tennessee, for the appellant, Kimberly E. Lapinsky.

Chris W. McCarty, W. Paul Whitt, and Mikel A. Towe, Knoxville, Tennessee; and Catherine B. Sandifer, Pigeon Forge, Tennessee, for the appellee, Janice E. Cook.

David M. Tilson, Morristown, Tennessee; and Mary Pamela Huddleston, Pigeon Forge, Tennessee, for the appellee, Kevin D. Cook.

Jon G. Roach, Knoxville, Tennessee, for the appellee, Brenda Brewster.

## OPINION

## Background

In May of 2013, Plaintiff and the Cooks entered into a Purchase and Sale Agreement ("the Contract") for Plaintiff to purchase from the Cooks real property containing a house located at 1998 Tranquility Lane ("the House") in Sevier County, Tennessee. Brewster was the real estate agent for the Cooks in connection with the sale of the House. The Contract stated, in pertinent part:

**8. Inspections.**

\* \* \*

**E. Waiver of All Inspections. THIS BOX MUST BE CHECKED TO BE PART OF THIS AGREEMENT.**
**Buyer, having been advised of the benefits of inspections, waives any and all Inspection Rights under this Paragraph 8 (including but not limited to the Wood Destroying Insect Inspection Report).**

**9. Final Inspection.** Buyer and/or his inspectors/representatives shall have the right to conduct a final inspection of Property no later than **1** days prior to the Closing Date only to confirm Property is in the same or better condition as it was on the Binding Agreement Date, normal wear and tear excepted, and to determine that all repairs/replacements agreed to during the Resolution Period, if any, have been completed. Property shall remain in such condition until Closing at Seller's expense. Closing of this sale constitutes acceptance of Property in its condition as of the time of Closing, unless otherwise noted in writing.

\* \* \*

**18. Special Stipulations.** The following Special Stipulations, if conflicting with any preceding paragraph, shall control:
**1. Contract is contingent upon the buyers** [sic] **house in Commerce TWP, Michigan closing on or before June 10, 2013.**
**2. Seller to give the buyer first-right of refusal to purchase on sellers** [sic] **lot on Tranquility Bend – Lot 14. (Right next door to this house).**

2

**3. Seller to repair/replace/paint fix:**
    **a. Fix/paint white trim that is peeling on the driveway side.**
    **b. Re-flash/repair bow window in the office (water stains on ceiling) – as there is water intrusion**
    **c. Repair/replace the roof shingles where needed.**
**4. Wood-destroying insect inspection will stay with the contract until completed.**

Plaintiff checked the box for the "**Waiver of All Inspections**," waiving the inspection rights and responsiblities provided for under paragraph eight of the Contract.

The closing on the House occurred on June 14, 2013. In connection with the closing, Plaintiff executed a Buyer's Final Inspection form ("Final Inspection Form") on June 14, 2013. The Final Inspection Form stated, in pertinent part:

We, the Buyers, and/or our inspectors and/or our representatives, . . . .

\* \* \*

Have made the final inspection of the Property and confirm it to be in the same or better condition as it was on the Binding Agreement Date, normal wear and tear excepted, and all repairs and replacements, if any, have been made to our satisfaction, and we agree to accept the Property in its present condition.

\* \* \*

This Buyer's Final Inspection is made a part of the Purchase and Sale Agreement as if quoted therein verbatim. Should the terms of this Buyer's Final Inspection conflict with the terms of the Purchase and Sale Agreement or other documents executed prior to or simulantous to the execution of this Buyer's Final Inspection, the terms of this Buyer's Final Inspection shall control, and the conflicting terms are hereby considered deleted and expressly waived by both Seller and Buyer. In all other respects, the Purchase and Sale Agreement shall remain in full force and effect.

The sale closed, and Plaintiff took possession of the House. In January of 2014, Plaintiff sued the Cooks, Brewster, and Tennessee Farmers Mutual Insurance Companies ("Farmers Insurance") alleging claims for, among other things, breach of contract, intentional misrepresentation, conspiracy, and violation of the Tennessee Consumer

3

Protection Act of 1977. Plaintiff alleged that she discovered after the closing that the House had not been repaired as agreed in the Contract, that defects and damages had been hidden which allegedly eventually caused more damage to the House, and that the Cooks and Brewster had made misrepresentations with regard to the septic permit and the septic system. Brewster answered the complaint. Farmers Insurance answered the complaint, filed a counter claim against Plaintiff, and filed a cross-claim against the Cooks. The Cooks answered the complaint and each filed a cross-claim against Brewster.

The Cooks filed a joint motion for summary judgment supported by, among other things, the affidavit of Janice Cook, which stated, in pertinent part:

> 4. I was a homeowner making the isolated sale of my residence in connection with the Agreement and the sale of the Property to [Plaintiff].
> 5. I was not engaged as a real estate agent or broker selling houses in the course of the real estate trade, nor was I otherwise engaged in business or commercial activity with respect to the Agreement and the sale of the Property to [Plaintiff].
>
> * * *
>
> 7. I was never involved in any conspiracy with anyone regarding the sale of the Property.
> 8. In connection with the sale of the Property, the parties to the Agreement executed a "Buyer's Final Inspection" form ("**Final Inspection Form**") on June 14, 2013.

Kevin Cook filed a similar affidavit that stated, in pertinent part:

> 4. I was a homeowner making the isolated sale of my residence in connection with the Agreement and the sale of the Property to [Plaintiff].
> 5. I was not engaged as a real estate agent or broker selling houses in the course of the real estate trade, nor was I otherwise engaged in business or commercial activity with respect to the Agreement and the sale of the Property to [Plaintiff].
>
> * * *
>
> 7. I was never involved in any conspiracy with anyone regarding the sale of the Property.

Brewster also filed a motion for summary judgment.

4

Plaintiff was deposed. During her deposition, Plaintiff testified that she closed on the sale of the House voluntarily and of her own free will. When asked what she did to inspect the House prior to closing, Plaintiff stated:

> We went to the home. We made an appointment to get in and inspect the house and the damages, and I couldn't tell you the date. And my husband inspected the full house and we made the conditions with - - Phil Derosia was with us at the time.
>
> And upon being done for the final purchase of the house, we required the conditions of the roof, the water damage to the inside of the home, and the flashings on the side of the home to be installed properly because there was water instrusion into the home.

Phil Derosia was Plaintiff's real estate agent in connection with Plaintiff's purchase of the House.

Plaintiff testified that she did not hire a contractor or inspector to inspect the House because her husband is a licensed general contractor in Michigan, and he inspected the House. Plaintiff testified that her husband has been a builder for approximately 35 years. Plaintiff accompanied her husband when he inspected the House.

When asked what her husband did to inspect the House, Plaintiff stated:

> Well, he went through basically everything. He went up on the roof. He went on the ladder to the sides and the flashings. He inspected the brick. He inspected the basement. He inspected the insulation, the wiring, the water lines in the - - I mean, he inspected everything. . . . Inside and out. . . . If it was visible, absolutely, he would - - if it was visible, yeah, I guess you could say he saw it.

Plaintiff agreed that she relied upon her husband's inspection.

Plaintiff testified that her husband was with her for the final inspection on the day of closing. She stated: "We didn't get really to have a final inspection that day." When asked why she did not get to have a final inspection, Plaintiff stated:

> Our real estate agent, Phil Derosia, kept contacting the Cooks' real estate agent, Brenda Brewster, to get us in for final inspection on the home. Finally, we got a phone call that told us that we should have made an

5

appointment previous to that, but, yeah, they would let us in for final inspection, which was approximately, and I'm not going to quote myself, it was about 45 minutes before closing at the Smoky Mountain Title.

And, so, my husband, who did not have a ladder to get up on it at this point to do final inspection, so we thought that at our closing we'd be able to question Ms. Brewster and the Cooks of the work that was supposed to be - - have been done to the house, but they were not there.

Plaintiff was asked if she could have set a different closing date in the Contract, and she stated:

No. . . . I had to have it June 14, 2013. . . . Because my home was still up in Michigan, our home was being sold - - had been sold in Michigan. So it was on a time frame of us traveling back down here and the closing up in Michigan to be able to close on this home down here.

Planitiff agreed that this was not a circumstance forced upon her by the Cooks. Plaintiff was asked if she could have moved the closing date in the Contract back to give more time for inspection, and she stated:

No, I wouldn't. . . . Well, at the closing that we had set up, we made explicit travel arrangements to come down here for the closing of - - [the House] . . . . And with my health issues and whatever, there was time frames that I could be down here this many certain days and then get back to Michigan for the pack up and whatever of our home because, then, we were moving our - - our closing - - . . . .

Plaintiff was asked about the work that was to have been done to the House pursuant to the Contract. Plaintiff admitted that pursuant to the Contract, the only things the Cooks were to have repaired/replaced/painted/fixed were the three things listed in the Contract as:

**Seller to repair/replace/paint fix:**
**a. Fix/paint white trim that is peeling on the driveway side.**
**b. Re-flash/repair bow window in the office (water stains on ceiling) – as there is water intrusion**
**c. Repair/replace the roof shingles where needed.**

Plaintiff explained that the flashing that was supposed to be repaired pursuant to the Contract was located "off the office" and "off the master bedroom" on the bay

6

windows. Plaintiff admitted that both of these spots were on the exterior of the House and could be seen from the exterior of the House.

Plaintiff was questioned about the provision in the Contract requiring the Cooks to fix/paint white trim that is peeling on the driveway side, and she stated that this trim was located on the "peak of the house," and also was on the exterior of the House. Plaintiff admitted that she would not have needed access to the interior of the house to see that trim.

Plaintiff was asked who came up with the contingency in the Contract to repair/replace the roof shingles where needed, and she stated that her husband did. Plaintiff was asked if her husband believed that there were roof shingles that needed to be repaired or replaced, and she stated:

> Pretty much the whole roof because there was - - there was, you know, spots of the roof that had been covered over, and so there were shingles that were missing. We decided that we would take care of the gutters ourself. This is all requested through our realtor, Phil and Darlene Derosia.

Plaintiff agreed that missing shingles could be seen from the ground elevation outside the House, and that they did not need access to the interior of the House to see them.

Plaintiff was asked what she contended was done to conceal problems with the roof, and she stated:

> There was tar and caulk put into holes on the roof. You got to go - - I'm going by hearsay with my husband, so I don't know the specifics. But there was shingle, what he called shingle dust put over it to kind of cover up those tarred areas.
>
> The caulking that was done, the flashing was not done. What was done was big tubes of caulk thrown in behind the flashings and down the flashings, and tar and caulk thrown into where shingles should have been on the roof.

Plaintiff admitted that these things were visible when her husband got on the roof after closing.

Plaintiff admitted that she closed on the Property knowing that the Contract contained a clause that stated: "Closing of this sale constitutes acceptance of Property in its condition as of the time of Closing, unless otherwise noted in writing." Plaintiff also

admitted that she understood that she needed to conduct an inspection of the House prior to closing. She further admitted that she received the Disclaimer Notice that warned that failure to inspect meant accepting the House 'as is.'

Plaintiff admitted that she signed the Final Inspection Form that stated that she accepted the House in its present condition: "At closing, yes." With regard to the Final Inspection Form, Plaintiff stated: "This document was signed at the closing. That's why I put the time on there and expected that the Cooks, Janice and Kevin and their realtor, would be at our closing. And that's why I specifically put the time on this final inspection, . . . ."

Plaintiff admitted that she voluntarily executed the Contract and that she was under no duress to sign. She also admitted that she signed the Tennessee Residential Property Condition Disclosure voluntarily and that she knew what she was signing. Plaintiff further admitted that she signed the Additional Required Residential Disclosures voluntarily. Plaintiff admitted she waived a home protection plan for the House and that she signed the Final Inspection Form accepting the House in its present condition.

Plaintiff stated: "I did close on it of my own free will with the exception of being able to speak to the Cooks and the real estate agent about the work that was supposed to be performed on the home for final inspection." She further stated:

> [A]t that closing with the attorney that was present and not being able to get the full final inspection, the question was raised from me to him, not knowing Tennessee laws as far as purchase and selling of homes, I said we weren't allowed a full inspection, you know, the timing of a full inspection, and I'm signing this pretty much under duress because I want to know if the repairs were done and completed.
>
> My reply that I got back was that they did sign off, the Cooks, that the repairs were done and completed. And I said, "Well, I'm kind of stuck not being able to do the full inspection." And he says, "Well, you'll have a year warranty on it."

Plaintiff could not recall the name of the attorney who was at the closing. She stated, "he was the closer for Smoky Mountain Title."

Plaintiff admitted that all of the conversations with the Cooks went through her realtor to their realtor, Brewster. Plaintiff admitted that she never had any conversations directly with Brewster. Plaintiff also admitted that the Cooks never told her she had a warranty, and no one on behalf of the Cooks told Plaintiff that she had a warranty.

Plaintiff testified that she started seeing problems with the House "immediately." She stated:

> It was the roof, the water seepage in through our bedroom, water seepage into the, what we call the bunker room where the water heater is down in the basement. Quite a few different things. I don't remember them all. The main thing was the roof and the flashings on the home.

Plaintiff testified about a sudden storm, which occurred in September of 2013, after she had closed and taken possesion of the House. She stated:

> And all of a sudden, a storm hit, and as we were - - came up from the basement, rain was pouring in between what we call the breakfast nook and the kitchen area of the home, and water seepage, you know, the ceilings were wet. It was just water everything. But that was the main spot that it was just, you could see it just pouring into the house.

> Plaintiff was questioned about her claim for conspiracy, and she stated:

> So I feel because of the divorce between Mr. Cook and Ms. Cook, that they needed their money immediately and that's why it was not disclosed properly to me. . . . Well, they are also friends. . . . That's my personal feeling, and the fact that Brenda Brewster and Ms. Cook are very good friends, and that Ms. Brewster's son was staying in the home out of his mouth.

Plaintiff admitted that she has no personal knowledge of any agreement between the Cooks and Brewster to engage in a conspiracy. When asked if she knew of anyone who had knowledge of the existence of the alleged conspiracy, Plaintiff stated:

> As a conspiracy between them, no, but wordings of sorts that - - that Ms. Cook was very well aware of the damages to the house by filing the claim and that she is friends with Brenda Brewster, so, obviously, Ms. Brewster had to know of the damages before that house was sold.

> When asked if the Cooks were real estate agents or brokers, Plaintiff admitted that the House was the Cooks's residence and that she had no idea what their employment was.

9

Plaintiff's husband[1] also was deposed.  Plaintiff's husband testified that they looked at other houses prior to looking at the House.  He stated: "When we pulled up to Tranquility Lane, she was thrilled.  I just kind of got out, semi out of the car and I looked at it.  She was thrilled.  I said, "Buy it."  That's all I said."  He testified about his initial inspection of the House stating:

> I don't remember exactly what day.  What I do remember is I inspected the house.  It was approximately four hours and I went through every inch of it. . . .  It's the average time. . . . Depending on the size of the home.  But a three bedroom home with that kind of square footage, yes. . . .  Whatever I do in the construction field and in the inspection field, I'm meticulous at it.  I look at stuff that might not even be there, but I still look.

When asked to state what he found when he inspected the House, Plaintiff's husband testified:

> Starting from the exterior, I saw two shingles missing.  I saw torn shingles.  I saw gutters hanging off the soffits, away from the soffits.  I saw mortar damage around the field stone.  I saw deck posts split.  I saw damage to the garage door.  I saw flashings over the bay windows incorrectly installed and caulked.
>
> I saw missing screens for a window.  I saw a ripped screen for a window.  I saw the back of the garage that was not finished brick.  I saw paint missing on the fascia of the garage side of the home.
>
> I saw wood boring - - at first I thought it was carpenter ants, but Phil Derosia said it was wood-boring bees drilling into the deck posts of the deck on the garage side.
>
> I located the well.  I measured from the well to the area described as the septic field. . . .  There was a piece of paper that showed a survey of the septic field, the location of the tank and how the field was trenched and laid. . . .  I believe [that paper] was provided by Derosia.

* * *

---

[1] Plaintiff's husband was not a party to the purchase of the House and holds no interest in the House.  As such, he is not a party to this suit.

10

When I walked in, the first thing I noticed was the interior of the house was not painted, it was just drywall primer. That was the first thing I noticed. It was never painted.

As I walked through the home, I noticed scratches into the hardwood appearing to be from a dog or something clawed, or maybe furniture pulled across it, but pretty well scratched up, both in the living room, the hallway and the master bedroom.

I noticed an enormous amount of light switches that was kind of odd. I noticed water damage in what they called an office room. I noticed the normal cracks where corner bead of drywall would come away from the corner. . . . That would indicate a person that wasn't a professional drywaller. . . . It's sloppy work.

\* \* \*

I noticed in - - I don't know if - - I guess they refer to it as a breakfast nook, I call it the tower room, that the door in the tower room appeared to be - - the frame was split and broken. It didn't lock properly whatsoever.

I noticed the back door, which was wood, weathered extremely from the outside and the frame of the inside where it locked, the frame was split.

Not anything visible as far as screw or nail pops from the drywall installation visible from the floor. I saw a lot of paint runs or I should say primer runs. . . . That's just sloppy painting.

\* \* \*

I noticed a very foul smell in the fireplace such as a dead animal.

As I went upstairs, I saw that the floor of the bathroom upstairs was linoleum, unheard of. . . . [A]ny kind of humidity from shower or dampness will lift linoleum up off a quarter of an inch of plywood. . . . I didn't see a problem, but I saw eventually a problem if the bathroom was going to be used. . . . I saw that the venting of the main floor bathroom and the upstairs bathroom was out of square. I noticed that the light on the upstairs bathroom above the bathtub was off center.

\* \* \*

11

Well, I also did notice upstairs that the electrical box was not sufficient to, again, Michigan Code or US Code. I was not aware that at that time Tennessee followed something called the International Code.

I also noticed that in the upstairs that there was no egress windows, it was just regular windows. . . . For fire safety . . . a fireman with an oxygen tank must be able to go through that window without any obstruction whatsoever. . . . That is a Michigan code.

* * *

The basement then - - . . . the only thing I saw was open insulation, totally against the Environmental Protection Agency Code. That's like breathing death, automatic cancer.

I noticed wetness on the block wall by the window by the walk-out doors. I noticed that there was no control valves whatsoever for the Sillcocks for the outside. I noticed that there was no cleanout whatsoever inside the basement for the septic system.

And, of course, still thinking about how the septic field was laid, being on a 45-degree pitch plus, I looked into the electrical box, the circuit breakers, looking for a pump thinking that maybe there was a pump installed to pump up the sewage up to it, but there was not.

The bathroom in the basement appeared to be never, never used whatsoever.

The utility room - - the only think that I did notice is looking at the lower Sillcock, to drain that water heater, the seal was still on the Sillcock, which told me that the water heater was never cleaned - - drained or cleaned.

I also noticed that electrical wires from the electrical box stretching across, which would include 110 and 220 lines, were just hanging from the ceiling unshielded.

I believe that's about it.

12

Plaintiff's husband testified that he told Plaintiff and her realtor "there is water damage in the house." He also stated:

There was water damage in the, what they call the business room. There was slight water damage appears, slight water damage starting in the master bedroom at the windows.

I said - - I stated that the flashings around both bay windows were incorrectly installed and one of them replaced. And I went as far as sent them, when I got back to Michigan, the right way to install flashing for bay windows.

\* \* \*

And I told [Mr. Derosia] specifically I wanted all shingles replaced. . . . All shingles. . . . Yes, on garage and home.

Plaintiff's husband agreed that he had stated that he wanted a total re-roofing.

Plaintiff's husband testified that he and Plaintiff obtained permission to place a trailer at the House two days before closing, but were told they could not "unload it because technically it wasn't our property."

Plaintiff's husband was questioned about the final inspection, and he testified:

We were asking for final inspection. That was communicated to Phil Derosia, which was being communicated to Brenda Brewster, and continuously asking and asking. This was right after the trailer was dropped off, so that was two days before closing.

The day before closing, it was the same, continuously asking for final inspection with no reply from Brenda Brewster, continually, continuously.

And then on the day of closing, we waited at the property for Phil Derosia while my wife was still in conversation by cell phone to get permission for final inspection from Brenda Brewster and still nothing.

Phil Derosia did arrive at the house. Still hadn't had permission for final inspection. And something, like, 30 to 40 minutes before closing, he finally got permission.

13

Plaintiff's husband testified that at that point the sale of the house in Michigan had closed, and: "Money was already wired." He stated:

> All I said - - all I said was, "I don't have enough time to do a final inspection." I kept saying that. I walked through the home. Never had a chance to unload the trailer to get on the roof because there was a ladder in that trailer.
>
> And, again, 30 to 40 minutes. So I walked through the home and I looked - -

* * *

> I walked through the home. I walked into the room known as the business room. I looked - - . . . . And all was - - the only thing that was done is the ceiling was just primed over. . . . Well, whoever took a roller, stuck it in primer and rolled over the spot of where the - - the spots across the ceiling where the water was. . . . I walked outside. I walked down the front porch. I leaned over the railing to look at the flashings. Nothing was done except caulked. They were not replaced. . . . I came off the porch. I walked to the street at the end of the driveway and I looked off at the roof. I saw a few shingles replaced that were miscolored. . . . They didn't match. . . . I walked around to the bay window side of the home and I stepped back and just looked and, again, I just saw caulk, an enormous amount of caulk around the flashings.
>
> I went from there around through the back and I approached the garage. Nothing was done to the garage shingles whatsoever.

* * *

> I came to my wife and Phil Derosia and they kept telling me what - - "we got to go, you got to go to closing, you got to go to closing." I said, "Nothing was really done. They just painted over the water spots, they didn't do anything with the flashing except caulked them, and just replaced a couple of shingles." And it was said, "Well, at closing, you can discuss that with Brenda Brewster and the Cooks at closing, plus you have one year if there is a problem."

14

When asked who told them they had one year if there was a problem, Plaintiff's husband stated: "I believe Phil Derosia said that." Plaintiff's husband did not hear any discussion about postponing or extending the closing.

Plaintiff's husband admitted that they found some bricks allegedly hidden in the woods on the day of his initial inspection. He also admitted that he observed prior to the closing that the House did not have a new roof and that the garage did not have a new roof and that he pointed these facts out to his wife. Plaintiff's husband admitted he did not get on the roof when he did the first inspection of the House. He stated that he based his demand for a new roof on the fact that he could see missing shingles, torn shingles, and curled shingles, and "water leakage inside the home" without getting on the roof.

Plaintiff's husband was asked if there was pressure for Plaintiff to close on the House, and he stated:

> It was - - there was pressure to close. I don't know exactly where it comes. I know it wasn't pressure from my wife, but it seemed like there was pressure to close. . . . I can't indicate who, what, where because, again, I was very frustrated, upset, especially after the effort I made of stating what should have been replaced.

Plaintiff's husband testified that the Cooks and Brewster were not at the closing. He stated that he, Plaintiff, Phil Derosia, and a gentleman from the title company were the only persons present at the closing. Plaintiff's husband admitted that it was "[f]air to say" that if there was pressure to close it came from Phil Derosia or the gentleman from the title company. When questioned about the 90-day window to close and the fact that the house in Michigan had already sold, Plaintiff's husband stated: "We weren't desperate to purchase a home. . . . I mean, we could have leased something, we could have just went to a hotel and stayed until we found one."

After a hearing, the Trial Court entered its order on March 25, 2015, granting summary judgment to the Cooks and Brewster after finding and holding, *inter alia*:

> First of all, with respect to the - - to the contract claims against the seller, we've got claims of - - of defects in the house that the buyers bought. If you look at the contract, which is undisputed in the record under paragraph eight entitled inspections: "The parties hereto agree that in the event" - - well, I'm - - bottom line of it is, contract specifically provides that the buyers had the right to inspect. It goes further: "The parties hereto agree that in the event buyer shall elect a contract with a third party inspector to obtain a, quote, home inspection, unquote, as defined by

15

Tennessee law, said inspection shall be conducted by a licensed home inspector." The buyer had the right to hire a licensed home inspector, but - - but she didn't have to.

The contract goes on: "However nothing in this paragraph shall preclude buyer from conducting any inspections on his/her own behalf, nor shall it preclude buyer from retaining a qualified, and if required by law, licensed professional to conduct inspection of particular system." So the buyer had the absolute right under the contract for 30 days prior to closing to inspect for herself, to hire third party inspectors, to inspect to her - - to her satisfaciton, and she didn't do it, the last sentence of paragraph eight, or to the extent she didn't get inspected, it's her own fault and not that of the buyers' [sic].

And in the last sentence of paragraph eight: "In the event buyer fails to timely make such inspections and respond within said time frame as described herein, the buyer shall have forfeited any rights provided under this paragraph eight, and in such case shall accept the property in its current condition, wear and tear, accept it [sic]. That's one provision, but that's not the only provision.

When you - - when you get to the buyers' final inspection form, which was executed on the date of the closing, 6/14/2013: "We the buyers, and/or our inspectors and/or our representatives." And she checked the box: "Have made the final inspection of the property and confirm it to be the same - - in the same or better condition as it was on the binding agreement date, normal wear and tear accepted [sic] and all repairs and replacements, if any, have been made to our satisfaction, and we agree to accept the property in its present condition."

Now, the plaintiff here argues that, look, we only - - we only were allowed to do our final inspection 30 minutes before the closing. Taking that as absolutely true, it doesn't change the result here because they had the absolute right under the contract to inspect themselves or to hire third party inspectors for a full period of 30 days. The fact that the plaintiff was from Michigan and was trying to sell her own home in Michigan doesn't get her off the hook for having responsibility to - - to - - and the right and the responsibility to go ahead and inspect anytime within that 30 day period. Was it perhaps inconvenient? I'm sure it was. I'm sure it would have been, but, again, that is a matter that falls upon the plaintiffs' shoulders, not the defendants/sellers.

16

With respect to the - - the claims of - - of fraud here, the Court is constrained to hold that - - that the sellers - - and by the way, the real estate agent are entitled to summary judgment on the claims of fraud simply because there - - there is no - - there was no - - that there's no genuine issue of material fact with respect to reasonable reliance on the part of the plaintiff. And the point there is that - - and the Court has referred to some - - some case law and there's a plethora of it that holds that generally speaking in an arm's length transaction, one party cannot hold the other liable for - - for fraud if the information upon which the fraud claim is based was equally as available to one as it was to the other, even if it is an actual fraudulent statement or a negligent fraudulent statement or a nondisclosure, a simple nondisclosure, which may also amount to fraud in certain circumstances, but the point is either, under either of those theories.

For a plaintiff to hold a defendant liable for fraud, he's got to be able to show that I reasonably relied upon either the outright fraudulent statement, the negligent fraudulent statement or the - - or the nondisclosure. And in - - in Tennessee law where there is the opportunity to have discovered the fraud, whatever species of fraud it was, where there was the opportunity to discover it, then - - and you didn't discover it, then you cannot hold the other side liable for - - for fraud. In other words, you've got to exercise due diligence yourself, and if you do not exercise due diligence to discover that which is there to be discovered, then you cannot have reasonably relied upon fraud even if it in fact existed before you failed to exercise due diligence.

Here - - here there is no issue of fact there. There were two inspections. One immediately before the closing but - - but one previous that - - that was without question some four hours long and without question by the - - the plaintiff's own husband, who himself is a general contractor out of - - out of Michigan, and the big - - the big thing here about the - - about the roof and about the shingles on the roof is should they have been replaced, or was there some fraud, some nondisclosure, some covering up, assuming that there was some fraud disclosure, some covering up, and for purpose of this motion I assume that there was.

Nevertheless, was there reasonable reliance? Another reason the Court concludes that there was not. Reasonable reliance is it's undisputed that the plaintiff's own husband told her, look, that whole roof needs to be - - needs to be  replaced - - that whole roof needs to be replaced. Well, how

17

can you reasonably rely on anything - - assuming you could otherwise reasonbly rely - - how can you reasonably rely on anything thereafter when your own husband, a contractor, said, look, that whole roof needs to be replaced, in the Court's opinion you can't.

You come back to - - we come back to - - there is also a - - a - - a theory here of - - of conspiracy and the - - there is - - the record here just contains no evidence that there was any conspiracy extent [sic] in this case at all, then so the Court holds that the - - the defendants had demonstrated that the plaintiffs' proof is insufficient to - - to sustain a claim on the - - on the conspiracy theory.

\* \* \*

Finally - - well, not finally, next to finally I should say, the duress claim, there is just, once again, is no evidence in the record of duress by the - - duress by the - - the defendants here or any of them. There was pressure - - there was pressure, but not from the defendants really upon the plaintiffs. So, once again, the Court holds that - - that the defendants have demonstrated that - - that the plaintiff simply has insufficient evidence to sustain a duress claim.

Last thing, the TCPA, with respect to the - - the sellers, homeowners, the Cooks, the evidence here is clear that this was an isolated sale of a - - of a home by the homeowners themselves, and we know since Gansevoort versus Russell, was it, Gansevoort versus sombody, 20 odd years ago, that - - that the TCPA does not apply to an isolated sale of a piece of real property by the owner of the property himself. That is to say somebody that is not in the business of selling real property, and so the plaintiffs - - rather, the defendants could. The sellers are entitled to summary judgment with respect to the TCPA claim.

Now, the - - the TCPA claim against Ms. Brewster - - Ms. Brewster, while generally she is subject to the TCPA, they are just - - the – the evidence is undisputed here that there is just no - - there just was no deceptive trade or practice that - - that Ms. Brewster engaged.

After the Trial Court granted them summary judgment, the Cooks and Brewster moved for attorney's fees pursuant to Tenn. Code Ann. § 47-18-109(e)(2) of the Tennessee Consumer Protection Act of 1977. The Trial Court denied the motions finding and holding that it was a close question as to the Cooks because Plaintiff may not have

18

known when she filed suit if the Cooks were subject to the Tennessee Consumer Protection Act of 1977, and, therefore, the Trial Court would not find the claim against the Cooks to be frivolous. The Trial Court further found and held that while Brewster was subject to the Tennessee Consumer Protection Act of 1977 as a real estate agent, the fact that Brewster prevailed on her motion for summary judgment did not necessarily make Plaintiff's claims frivolous.

Plaintiff and Farmers Insurance voluntarily dismissed their claims against each other. Plaintiff appeals to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises two issues on appeal: 1) whether the Trial Court erred in granting the Cooks and Brewster summary judgment; and, 2) whether the Trial Court erred in refusing to allow Plaintiff to conduct additional discovery before ruling on the motions for summary judgment. The Cooks raise an issue with regard to whether the Trial Court erred in denying their motion for attorney's fees pursuant to Tenn. Code Ann. § 47-18-109(e)(2)[2].

We first consider whether the Trial Court erred in granting the Cooks and Brewster summary judgment. As our Supreme Court has instructed:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

---

[2] Brewster failed to raise this as an issue on appeal. Although Brewster mentions her demand for attorney's fees in the conclusion section of her brief, she failed to include this issue in her statement of the issues raised on appeal. "Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001).

\* \* \*

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

20

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

Plaintiff's complaint alleged claims for breach of contract, intentional misrepresentation, conspiracy, and violation of the Tennessee Consumer Protection Act of 1977. We will consider each of these claims in turn.

Considering Plaintiff's claim for breach of contract first, we note that with regard to Brewster, Plaintiff admitted that she had no contract whatsoever with Brewster. As Plaintiff had no contract with Brewster, it follows that Plaintiff cannot prove a breach of contract claim against Brewster. Brewster made a properly supported motion for summary judgment demonstrating that Plaintiff's evidence was insufficient to establish her claim for breach of contract, and Brewster was entitled to summary judgment on this claim as granted by the Trial Court.

With regard to the Cooks, Plaintiff alleged that the Cooks were in breach of contract for failing to fulfill the three contingencies contained in the Contract, *i.e.*, "**Fix/paint white trim** . . . ," "**Re-flash/repair bow window in the office (water stains on ceiling) – as there is water intrusion**," and "**Repair/replace the roof shingles where needed**." Plaintiff, however, signed the Final Inspection Form, which stated that she, or her representatives had:

> made the final inspection of the Property and confirm it to be in the same or better condition as it was on the Binding Agreement Date, normal wear and tear excepted, and all repairs and replacements, if any, have been made to our satisfaction, and we agree to accept the Property in its present condition.

Plaintiff testified that she executed the Final Inspection Form voluntarily and of her own free will. The Final Inspection Form provided that upon execution it became a part of the Contract "as if quoted therein verbatim." The Final Inspection Form clearly and unambiguously provides that the House was "in the same or better condition" than it was on the date that the Contract was executed, that any repairs or replacements had been made to Plaintiff's satisfaction, and that Plaintiff agreed to accept the House "in its present condition."

As this Court explained in *Quebecor Printing Corp. v. L & B Mfg. Co.*:

> In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed.*

*Compress & Warehouse Co., Inc*., 78 S.W.3d 885, 889–90 (Tenn. 2002)(citing *Guiliano v. Cleo, Inc*., 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co*., 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998)); *Doe v. HCA Health Servs. of Tenn., Inc*., 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id*. (quoting 17 Am.Jur.2d, *Contracts*, § 245).

This Court's initial task in construing the [contract] at issue, as was the Trial Court's, is to determine whether the language of the contract is ambiguous. *Planters Gin Co*., 78 S.W.3d at 890. If the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute. *Id*. A contract is ambiguous only when its meaning is uncertain and may *fairly* be understood in more than one way. *Id.* (emphasis added). If the contract is found to be ambiguous, we then apply established rules of construction to determine the intent of the parties. *Id*. Only if ambiguity remains after applying the pertinent rules of construction does the legal meaning of the contract become a question of fact. *Id*.

\* \* \*

It is not the role of this Court "to make a different contract than that executed by the parties." *Posner v. Posner*, No. 02A01–9710–CV–00249, 1997 WL 796216, at \*2–3, 1997 Tenn. App. LEXIS 930, at \*6 (Tenn. Ct. App. Dec. 30, 1997), *no appl. perm. appeal filed. See also, e.g., Central Drug Store v. Adams*, 184 Tenn. 541, 201 S.W.2d 682 (1947). "In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought to be harsh or unjust." *Tenpenny v. Tenpenny*, No. 01–A–01–9406–CV–00296, 1995 WL 70571, at \*6, 1995 Tenn. App. LEXIS 105, at \*15 (Tenn. Ct. App. Feb. 22, 1995), *appl. perm. appeal denied July 3, 1995*.

*Quebecor Printing Corp. v. L & B Mfg. Co.*, 209 S.W.3d 565, 578-81 (Tenn. Ct. App. 2006).

Plaintiff cannot now claim that the repairs to be done pursuant to the Contract were not done because Plaintiff agreed via the Final Inspection Form that any repairs or replacements had been made to her satisfaction. Plaintiff attempts to utilize parol evidence to vary the terms of the Contract. As the Contract is clear and unambiguous, Plaintiff cannot use parole evidence to vary the clear and unambiguous written terms of the Contract. Given all this, the Cooks made a properly supported motion for summary judgment demonstrating that Plaintiff's evidence was insufficient to establish her claim for breach of contract, and the Cooks were entitled to summary judgment on this claim as granted by the Trial Court.

With regard to Plaintiff's claim for intentional misrepresentation, Plaintiff alleged that the Cooks failed to repair the House as agreed in the Contract, that the Cooks and Brewster covered over and hid defects and damages, and that the Cooks and Brewster misrepresented facts about the septic permit and the septic system. In her brief on appeal, Plaintiff alleged that the Cooks and Brewster represented to her that the repairs pursuant to the Contract had been done and that Plaintiff relied upon these representations and proceeded to close on the House and take possession.

Our Supreme Court has instructed as to the elements which must be proven in order to prevail on a claim for intentional misrepresentation stating:

> Our current common-law claim for intentional misrepresentation is the successor to the common-law action for deceit. *First Nat'l Bank of Louisville v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991). In fact, "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999). In this opinion, we will refer to the cause of action as a claim for intentional misrepresentation, and, in order to avoid confusion, we suggest that this term should be used exclusively henceforth. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012) (noting that "intentional infliction of emotional distress" and "outrageous conduct" were different names for the same tort and stating that the tort should be referred to as "intentional infliction of emotional distress").

> To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the

23

representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation. *Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d at 311 (quoting *Metropolitan Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)); *see also* 8 Tennessee Practice: Tennessee Pattern Jury Instructions—Civil § 8.36, at 357 (11th ed. 2011).

*Hodge v. Craig*, 382 S.W.3d 325, 342-43 (Tenn. 2012) (footnotes omitted). Thus, in order to prevail on her claim, Plaintiff must prove that she reasonably relied upon a representation made by the Cooks and Brewster.

As discussed more fully above, Plaintiff executed the Final Inspection Form in connection with the closing, which stated that Plaintiff had made a final inspection and found the House to be in the same or better condition than it had been when the Contract first was executed, that all repairs or replacements had been made to Plaintiff's satisfaction, and that Plaintiff accepted the House in its present condition. As the Contract that Plaintiff voluntarily and of her own free will executed stated that the repairs had been made to Plaintiff's satisfaction and that Plaintiff was accepting the House in its present condition, Plaintiff cannot have reasonably relied upon any representations made by the Cooks or Brewster with regard to repairs.

Furthermore, we note that even though Plaintiff signed the Final Inspection Form stating that she did do a final inspection, she complains that she was not allowed a full and final inspection of the House. Both Plaintiff and her husband testified, however, that they could tell from the final inspection that they did do on the day of closing that the repairs Plaintiff and her husband had expected would be done had not been done. Plaintiff testified that areas which were to have been repaired pursuant to the Contract could be seen from the exterior of the House and that they could see that the expected repairs had not been done. Plaintiff's husband testified that he told Plaintiff that "Nothing was really done. They just painted over the water spots, they didn't do anything with the flashing except caulked them, and just replaced a couple of shingles." Thus, Plaintiff and her husband saw for themselves prior to closing that repairs had not been done. As such, Plaintiff cannot have resonably relied upon any representations made by the Cooks and Brewster that repairs had been done because Plaintiff knew otherwise. The Cooks and Brewster made properly supported motions for summary judgment negating an essential element of Plaintiff's claim for intentional

24

misrepresentation. The Cooks and Brewster were entitled to summary judgment on this claim as granted by the Trial Court.

Turning now to Plaintiff's claim for conspiracy, we note that this Court explained in *Kincaid v. SouthTrust Bank*:

> The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 720 (E.D. Tenn. 2001). Conspiracy claims must be pled with some degree of specificity. *McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002) (citing *Haynes v. Harris*, No. 01A01-9810-CV-00518, 1999 WL 317946, at *2 (Tenn. Ct. App. 1999)) (citations omitted). Conclusory allegations, however, unsupported by material facts will not be sufficient to state such a claim. *Id.*

*Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

Plaintiff testified that she had no evidence whatsoever to support her claim for conspiracy other than her vague 'feelings' due to the fact that the Cooks and Brewster allegedly were friends. This feeling alone is simply and completely insufficient to sustain a claim for conspiracy. The Cooks and Brewster made properly supported motions for summary judgment demonstrating that Plaintiff's evidence was insufficient to establish her claim for conspiracy, and the Cooks and Brewster were entitled to summary judgment on this claim as granted by the Trial Court.

We next consider Plaintiff's claim of violation of the Tennessee Consumer Protection Act of 1977 ("TCPA").

With regard to the TCPA, our Supreme Court has explained:

> In the context of a sale of real property, real estate agents and brokers selling houses "in the course of the real estate trade" are covered by the Tennessee Consumer Protection Act. *Ganzevoort v. Russell*, 949 S.W.2d [293] at 297 [(Tenn. 1997)]. However, we have also held that the Act does not apply to "sellers [who are] not in the business of selling property as owners or brokers" and, therefore, that "persons making an isolated sale of their home are not covered." *Ganzevoort v. Russell*, 949 S.W.2d at 298.

*Fayne v. Vincent*, 301 S.W.3d 162, 173 (Tenn. 2009). Given this, the TCPA does not apply to the Cooks who were involved in the isolated sale of their residence. The Cooks made a properly supported motion for summary judgment demonstrating that Plaintiff's evidence was insufficient to establish her claim for violation of the TCPA, and the Cooks were entitled to summary judgment on this claim as granted by the Trial Court.

Brewster, however, as a professional real estate agent was subject to the TCPA. As pertinent, Tenn. Code Ann. § 47-18-109 of the TCPA provides:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. §47-18-109(a)(1) 2013.

The Trial Court found that Plaintiff had not alleged any unfair or deceptive act by Brewster. Plaintiff herself testified that she never had any conversation whatsoever with Brewster. Brewster made a properly supported motion for summary judgment demonstrating that Plaintiff's evidence was insufficient to establish her claim for violation of the TCPA, and Brewster was entitled to summary judgment on this claim as granted by the Trial Court.

We next consider whether the Trial Court erred in refusing to allow Plaintiff to conduct additional discovery before ruling on the motions for summary judgment. Initially, Plaintiff did not file a response to the motions for summary judgment, but instead filed a motion to continue the hearing on the motions for summary judgment. Plaintiff sought the continuance to allow her to take the deposition of a representative of Farmers Insurance. Allegedly, Farmers Insurance was the insurance carrier for the Cooks when the Cooks owned the House, and the Cooks had made a claim for hail damage to the roof of the House a few years prior to Plaintiff and the Cooks entering into the Contract. The Trial Court denied Plaintiff the opportunity to conduct additional discovery, but did grant Plaintiff an additional thirty days to respond to the motions for summary judgment.

"Where, as here, a party seeks to continue a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56.07, we review the trial court's refusal

to grant a continuance for an abuse of discretion." *Regions Fin. Corp. v. Marsh USA, Inc.*, 310 S.W3d 382, 401 (Tenn. Ct. App. 2009). This Court has explained:

> Indeed, our Supreme Court has stated:
>
>> Where there is [the] slightest possibility that [the] party opposing [a] motion for summary judgment has been denied [an] opportunity to file affidavits, take discovery depositions or amend, by disposition of motion for summary judgment without 30 day interval following filing of motion, it will be necessary to remand case to cure such error.
>
> *Craven v. Lawson*, 534 S.W.2d 653 (Tenn. 1976). Further, this Court has stated that one method of defeating a properly supported motion for summary judgment is through a request for more discovery:
>
>> [Nonmoving] parties may deflect a summary judgment motion challenging their ability to prove an essential element of their case by (1) pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) rehabilitating evidence challenged by the moving party, (3) producing additional evidence that creates a material factual dispute, or (4) *submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery*. *Rains v. Bend of the River*, 124 S.W.3d 580, 587–88 (Tenn. Ct. App. 2003) (citing *Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83, 88–89 (Tenn. 2000); *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).
>
> *Regions Financial Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 401 (Tenn. Ct. App. 2009) (emphasis added). The interest in full discovery, however, must be balanced against the purpose of summary judgment: "[to] provide[] a quick, inexpensive way to conclude cases when there exists no dispute regarding the material facts." *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 13 (Tenn. 2008). Indeed, "[t]he philosophy of summary judgment is to avoid a needless trial in a case where, although the pleadings may indicate disputes over factual issues, facts outside the pleadings if known would clearly show that there is 'no genuine issue as to any material fact.'" *Id*. at 12 (quoting Donald F. Paine, *Recent Developments in Tennessee Procedure: The New Tennessee Rules of Civil Procedure*, 37 Tenn. L. Rev. 501, 516 (1970)).

> [T]his Court has previously held that a trial court's decision to deny additional time for discovery, in order for the non-moving party to meet summary judgment, "must be viewed in the context of the issues being tried and the posture of the case at the time the request for discovery is made." *Regions*, 310 S.W.3d at 401 (citing *Price v. Mercury Supply Co.*, 682 S.W.2d 924, 935 (Tenn. Ct. App. 1984)). Accordingly, a trial court only errs in refusing to grant additional time for discovery prior to the hearing on a motion for summary judgment when the non-moving party can show that "the requested discovery would have assisted [the non-moving party] in responding to [the moving party's] motion for summary judgment." *Regions*, 310 S.W.3d at 401 (citing *Simmons v. State Farm Gen. Ins. Co.*, No. W2003–02643–COA–R3–CV, 2004 WL 2715341, at *5 (Tenn. Ct. App. Nov. 24, 2004)).

*Cardiac Anesthesia Servs., PLLC v. Jones*, 385 S.W.3d 530, 536-38 (Tenn. Ct. App. 2012).

In the case now before us, the requested discovery, *i.e.*, the deposition of a representative of Farmers Insurance, would not have assisted Plaintiff in responding to the motions for summary judgment. Any information that could have been gleaned with regard to a claim made by the Cooks to Farmers Insurance with regard to the roof of the House prior to Plaintiff and the Cooks entering into the Contract would have had no relevance whatsoever to whether Plaintiff could prove her claims against the Cooks and Brewster, as discussed fully above. Although Plaintiff knew that there were problems with the roof prior to closing, as discussed more fully above, Plaintiff signed the Final Inspection Form accepting the House in its present condition and did so with the full knowledge that the repairs had not been done. As such, anything that Farmers Insurance knew about the roof of the House and its condition some years prior to Plaintiff and the Cooks entering into the Contract was immaterial to the issues at hand. Since the requested additional discovery would not have assisted Plaintiff in responding to the motions for summary judgment, we find no error in the Trial Court's denial of Plaintiff's motion.

Finally, we consider the issue raised by the Cooks regarding whether the Trial Court erred in denying their motion for attorney's fees pursuant to Tenn. Code Ann. § 47-18-109(e)(2), which provides:

28

In any private action commeced under this section, upon finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may require the person instituting the action to indemnify the defendant for any damages incurred, including reasonable attorney's fees and costs.

Tenn. Code Ann. § 47-18-109(e)(2) (2013). We review a trial court's decision with regard to whether to award attorney's fees pursuant to Tenn. Code Ann. § 47-18-109(e)(2) for abuse of discretion. *Wagner v. Fleming*, 139 S.W.3d 295, 304 (Tenn. Ct. App. 2004).

In the instant case, the Trial Court found that it was a close question as to whether Plaintiff's TCPA claim against the Cooks was frivolous. The Trial Court found this to be so because even though the Cooks were not subject to the TCPA, Plaintiff may not have known this when she filed her suit and may have needed to conduct discovery in order to determine if the Cooks were merely homeowners involved in an isolated sale of their residence, or not. We agree that this was a close question because the case had reached only the summary judgment stage when the Trial Court made its ruling with regard to Plaintiff's TCPA claims. If the case had progressed to trial, and Plaintiff had continued to pursue her TCPA claim against the Cooks after learning that they were homeowners involved in an isolated sale of their residence and, therefore, not subject to the TCPA, the determination of whether Plaintiff's claim could be considered frivolous may well have had a different outcome. Such, however, is not the situation in the case now before us. Given the posture of the case now before us, we cannot find that the Trial Court abused its discretion when it refused to hold Plaintiff's TCPA claim against the Cooks to be frivolous and, therefore, refused to award the Cooks attorney's fees pursuant to Tenn. Code Ann. § 47-18-109(e)(2).

Given all of the above, we affirm the Trial Court's March 25, 2015 order.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Kimberly E. Lapinsky, and her surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

29