IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 19, 2019 Session

## MILAN SUPPLY CHAIN SOLUTIONS INC. F/K/A MILAN EXPRESS INC. v. NAVISTAR INC. ET AL.

**Appeal from the Circuit Court for Madison County
No. C-14-285      Roy B. Morgan, Jr., Judge**

_____

### No. W2018-00084-COA-R3-CV

_____

This appeal involves a jury verdict in a commercial dispute pertaining to the quality of trucks purchased by the plaintiff, Milan Supply Chain Solutions, Inc. Contending that the purchased trucks were defective, Milan filed suit against Navistar, Inc. and Volunteer International, Inc., alleging various legal claims, including breach of contract, violation of the Tennessee Consumer Protection Act, and fraud. Although some of Milan's claims were dismissed prior to trial, the remaining fraud and Tennessee Consumer Protection Act claims were tried before a jury. Defendant Volunteer International, Inc. was granted a directed verdict upon the conclusion of Milan's proof and later awarded attorney's fees, but a monetary judgment for both compensatory and punitive damages was entered against Navistar, Inc. The parties now appeal, raising a plethora of issues for our consideration. For the reasons stated herein, including our conclusion that the asserted fraud claims are barred by the economic loss doctrine, we reverse the judgment awarded to Milan. We affirm, however, the trial court's award of attorney's fees in favor of Volunteer International, Inc.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which KENNY ARMSTRONG, and CARMA DENNIS MCGEE, JJ., joined.

Roman Martinez, Washington, D.C, Kevin Jakopchek, Chicago, Illinois, Eugene N. Bulso, Jr. and Paul J. Krog, Nashville, Tennessee, for the appellant, Navistar, Inc.

Marty Phillips, Adam Nelson, Jackson, Tennessee, Clay Miller, Lawrence R. Lassiter, Dallas, Texas and Donald Capparella, Nashville, Tennessee, for the appellee, Milan Supply Chain Solutions, Inc. f/k/a Milan Express, Inc.

Roman Martinez, Washington, D.C., Kevin Jakopchek, Chicago, Illinois, Eugene N. Bulso, Jr. and Paul J. Krog, Nashville, Tennessee, for appellee, Volunteer International, Inc.

Bradley M. Davis, Chattanooga, Tennessee, for *amicus curiae* Tennessee Chamber of Commerce and Industry.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Milan Supply Chain Solutions, Inc. ("Milan") is a logistics company that is engaged in the business of hauling refrigerated and dry van commodities across the country. Defendant Navistar, Inc. ("Navistar") is a Delaware corporation that manufactures trucks and other equipment. Defendant Volunteer International, Inc. ("Volunteer") is a Tennessee company that sells and services Navistar trucks and equipment.

The present dispute arose as a result of Milan's business dealings with Navistar and Volunteer, specifically its purchase of over two hundred Navistar trucks through a series of separate transactions. When Milan purchased its trucks, they were subject to a standard "Limited Warranty"; Milan also purchased "Optional Service Contracts" concerning the trucks. Pursuant to the terms of the "Limited Warranty" and "Optional Service Contracts," Navistar agreed to "repair or replace" parts of the trucks that proved defective. Among other things, however, the documents also provided that no warranties were given beyond those described in the warranty documents and that the warranties of merchantability and fitness for a particular purpose were specifically disclaimed.

On November 13, 2014, Milan commenced the present litigation by filing a complaint in the Madison County Circuit Court against both Navistar and Volunteer. The complaint alleged that the trucks purchased by Milan were defective and stated that not long after they were purchased, Milan "began to experience numerous breakdowns of the Trucks." Milan asserted that although it had taken the trucks to the "Navistar Network" for repair, it had been repeatedly delayed in getting the trucks back into operation. Milan further charged Navistar and Volunteer with making a number of misrepresentations concerning the trucks. According to Milan, it had been provided with false information regarding the trucks' performance capabilities, fuel economy, and overall fitness for use.

In a subsequently-filed amended complaint, Milan reiterated these same concerns and asserted several legal claims for relief, including breach of contract, breach of express and implied warranties, fraud, and violation of the Tennessee Consumer Protection Act. Although a number of Milan's claims were dismissed prior to trial,

including its warranty claims, asserted fraud and Tennessee Consumer Protection Act claims were allowed to proceed to trial before a jury.

After the close of Milan's proof, the Circuit Court ruled that a directed verdict should be entered in favor of Volunteer. As it explained in a subsequent order memorializing this ruling, the court noted that Milan's former president had specifically testified that Volunteer's representative was an honest and credible man. With regard to Navistar, however, the case was submitted to the jury for a verdict. After deliberating, the jury returned a verdict in favor of Milan, finding, among other things, that Navistar had represented that the trucks purchased were of a particular standard and quality when they were that of another. Pursuant to the Circuit Court's "Order of Judgment," which was entered on the jury's verdict, Milan was awarded over $10,000,000 in compensatory damages and $20,000,000 in punitive damages.

Following entry of the "Order of Judgment," various motions and responses to motions were filed by the parties, including a motion for new trial and accompanying memorandum of law by Navistar. Ultimately, the Circuit Court entered a series of orders wherein it denied Navistar's motion for new trial, awarded Milan attorney's fees and discretionary costs against Navistar, and awarded Volunteer attorney's fees and discretionary costs against Milan. This timely appeal followed.

## ISSUES PRESENTED

The parties raise a number of issues for our consideration in this appeal. In Navistar's appellate brief, it specifically raises the following matters:

1. Whether the trial court erred in holding that Tennessee's economic loss doctrine categorically does not apply to fraud claims.
2. Whether the trial court erred in holding that a commercial truck sold to a company for business use falls within the Tennessee Consumer Protection Act's definition of "[g]oods," Tenn. Code Ann. § 47-18-103(7).
3. Whether the trial court erred in holding that material evidence supported the jury's finding that Milan filed its Tennessee Consumer Protection Act claim within the one-year statute of limitations.
4. Whether the trial court erred in excluding evidence of conspicuous written disclaimers in the parties' agreements.
5. Whether the trial court erred in holding that Tennessee law does not require benefit-of-the-bargain damages to be calculated as of the time of sale.
6. Whether the trial court erred in upholding the jury's award of lost profits in the absence of any proof of lost profits.
7. Whether the trial court failed to carry out its thirteenth juror responsibility when it deferred to the jury's verdict without independently deciding whether it agreed with that verdict.

8. Whether the jury's $20 million punitive damages award was excessive and unreasonable in violation of Tennessee law or Navistar's due-process rights.

Milan separately raises the following two issues, restated verbatim from its brief:

1. The trial court denied Volunteer's motion for summary judgment on all Milan's misrepresentation-based claims, including Milan's claim under the TCPA, finding that there were "genuine issues of material fact," and Volunteer never claimed that the trucks were not "goods" under the TCPA. Though the trial court ultimately granted Volunteer's motion for directed verdict during the trial, it awarded attorney's fees to Volunteer under the TCPA. Did the trial court err because, having survived a summary-judgment motion, Milan's TCPA claim against Volunteer was not, by definition "frivolous, without legal or factual merit, or brought for the purpose of harassment?"

2. Under Tennessee law, a limited "repair or replace" remedy in a warranty can fail of its essential purpose if there is evidence that the seller is unable to effectively repair the goods. There was ample evidence in the summary-judgment record that whatever repairs Navistar did perform were ineffective, with multiple trucks needing multiple repairs of the EGR system, as well as evidence from Navistar's own internal records showing that it was never able to effectively repair the EGR system. Did the trial court err by dismissing Milan's breach of express warranty claims against Navistar by ruling that a limited "repair or replace" remedy cannot fail of its essential purpose as a matter of law as long as the seller performs repairs when asked and there were triable issues of fact as to whether the remedy failed of its essential purpose?

For its part, Volunteer separately raises as an issue whether it "is entitled to recover attorney's fees incurred on appeal."

## DISCUSSION

*Milan's Fraud Claims*

We turn first to what is perhaps the most contentious issue in this appeal: whether Milan's fraud claims are barred by the economic loss doctrine.

The economic loss doctrine is a judicially created principle that "prevents a party who suffers only economic loss from recovering damages under a tort theory." Jeffrey L. Goodman et al., *A Guide to Understanding the Economic Loss Doctrine*, 67 Drake L. Rev. 1, 2 (2019). Although it has been suggested that the doctrine would be better named the "commercial loss" doctrine, *see All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865 (7th Cir. 1999), this Court has previously indicated that "economic losses" in

this context can take two forms: direct economic losses and consequential economic losses attributable to a product. *McLean v. Bourget's Bike Works, Inc.*, No. M2003-01944-COA-R3-CV, 2005 WL 2493479, at *6 (Tenn. Ct. App. Oct. 7, 2005). "Direct economic losses relate to the product itself and include costs of repairing or replacing the product or the diminution in the product's value because it is of an inferior quality or does not work for the general purposes for which it was manufactured and sold." *Id.* On the other hand, consequential economic losses "include all other economic losses attributable to the product itself such as the loss of profits resulting from an inability to use the defective product." *Id.* "Economic losses" do not include personal injuries or damage to other property. *See Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009) ("The economic loss doctrine is implicated . . . when a defective product damages itself without causing personal injury or damage to other property.").

In this case, Milan's claimed injury stems from the alleged defectiveness of the purchased trucks. Its asserted losses are strictly commercial financial losses, and these losses implicate the type of injury for which the economic loss doctrine would bar tort recovery. The issue here, however, is whether some type of exception to the doctrine exists for fraud claims.

The economic loss doctrine, which is also sometimes referred to as the economic loss rule, was created by the courts to avoid the "coming collision between warranty and contract on the one hand and the torts of strict liability, negligence, fraud and misrepresentation on the other." *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 10-5, 580 (4th ed. 1995)). Its overarching premise is fairly straightforward:

> [C]ontract and tort are separate and distinct areas of the law that provide separate and distinct remedies. A party who enters into a contract which contains terms that limit recovery in the event of a breach [is] typically unable to circumvent such provisions by alleging a tort occurred as well. The warranty or contract's terms and conditions set forth the rules governing the relationship, and tort law does not expand the remedies of the contract beyond the agreed-to terms. Absent personal injury or damage to other property, the sole remedy lies in contract.

Goodman et al., *supra*, at 55–56 (internal footnotes omitted).

The conceptual simplicity of the doctrine notwithstanding, a review of case law across the country shows a lack of uniformity in the approaches taken, *see David v. Hett*, 270 P.3d 1102, 1109 (Kan. 2011) (noting that "the doctrine is viewed differently in various jurisdictions"), even prompting one judge to note that the economic loss rule has become a "confusing morass." *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So.2d

532, 544 (Fla. 2004) (Cantero, J., concurring). Whatever nuances may appear within and across jurisdictions, however, there is no question that the doctrine preserves an important distinction between the law of contracts and the law of torts. Goodman et al., *supra*, at 57; *see also* Steven W. Feldman, 21 Tenn. Practice: Contract Law and Practice § 1:4 (May 2019) (noting that the economic loss doctrine is "one important device that preserves the boundaries for contract and tort").

The policy undergirding the economic loss doctrine is that contract law and warranty law are best suited to address a purchaser's economic loss. As one court articulated this concept:

> [C]ontract theories such as breach of warranty are specifically aimed at and perfectly suited to providing complete redress in cases involving . . . economic losses. All of such losses are based upon and flow from the purchaser's loss of the benefit of his bargain and his disappointed expectations as to the product he purchased. Thus, the harm sought to be redressed is precisely that which a warranty action does redress.

*REM Coal Co., Inc. v. Clark Equip. Co.*, 563 A.2d 128, 129 (Pa. Super. Ct. 1989); *see also* Goodman et al., *supra*, at 11 ("Contract law, rather than tort law, protects a consumer's expectation interests[.]").

Parties are invariably free to negotiate the terms of their purchase agreements and warranties, and "[b]y preventing a plaintiff from recovering in tort for purely economic loss, the doctrine protects the right to allocate economic risks in contract." Goodman et al., *supra*, at 6. Consequently, the "economic loss doctrine prevents parties from subverting their contract and recovering in tort what they could not obtain through their contractual remedies." *Id.* at 7. A party's remedy, therefore, is left in his or her own hands. "[I]f consumers want to ensure a product they purchase meets their performance or business needs, their remedy is bargaining for a warranty that permits them to recover the costs of repair/replacement of the product and any consequent loss of profits." *Id.* at 15. In addition to its direct legal consequences pertaining to the viability of tort claims, the economic loss doctrine has practical market consequences through its enforcement of parties' warranties, helping the "manufacturer keep costs down so the average consumer does not have to pay a higher price." *Id.* at 24–25.

As Judge Richard Posner stated when discussing the economic loss doctrine,

> Where there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary

complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contract law. That law has been shaped by a tension between a policy of making the jury the normal body for resolving factual disputes and the desire of parties to contracts to be able to rely on the written word and not be exposed to the unpredictable reactions of lay factfinders to witnesses who testify that the contract means something different from what it says.

. . . .

If the seller makes an oral representation that is important to the buyer, the latter has only to insist that the seller embody that representation in a written warranty. The warranty will protect the buyer, who will have an adequate remedy under the Uniform Commercial Code if the seller reneges. To allow him to use tort law in effect to enforce an oral warranty would unsettle contracts by exposing sellers to the risk of being held liable by a jury on the basis of self-interested oral testimony and perhaps made to pay punitive as well as compensatory damages. This menace is averted by channeling disputes into warranty (contract) law[.]

*All-Tech Telecom, Inc.*, 174 F.3d at 865–66.

The California Supreme Court's decision in *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965), is frequently cited as the genesis of modern jurisprudence on the economic loss doctrine.[1] In that case, the plaintiff brought suit after a truck he purchased for heavy-duty hauling overturned and had to be repaired. *Id.* at 147. Ultimately, the California Supreme Court dismissed the notion that recovery in tort was available for solely economic loss, opining in relevant part as follows:

The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business

---

[1] It has been suggested, however, that the historical roots of the doctrine are traceable much further back in time and "lie in the nineteenth century." *See* Sidney R. Barrett, Jr., *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis*, 40 S.C. L. Rev. 891, 897 (1989).

unless he agrees that the product was designed to meet the consumer's demands.

*Id.* at 151.

Also influential in the growth of the doctrine was the United States Supreme Court's decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986). In that admiralty case, the United States Supreme Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871. The Court identified a "need to keep products liability and contract law in separate spheres" and expressed concern that contract law might "drown in a sea of tort." *Id.* at 871, 866. Quoting favorably to the reasoning from *Seely*, the Court stated as follows:

> "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." *Seely v. White Motor Co.,* 63 Cal.2d, at 18, 45 Cal.Rptr., at 23, 403 P.2d, at 151. When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.
>
> The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured. Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified.
>
> Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value." The maintenance of product value and quality is precisely the purpose of express and implied warranties. Therefore, a claim of a nonworking product can be brought as a breach-of-

warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract.

Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power . . . we see no reason to intrude into the parties' allocation of the risk.

*Id.* at 871–73 (internal footnotes omitted and some internal citations omitted).

Although the economic loss doctrine is undisputedly a valid feature of Tennessee law, *see Lincoln Gen. Ins. Co.*, 293 S.W.3d at 488–92 (analyzing whether a sudden, calamitous event could give rise to an exception under the economic loss doctrine); *Trinity Indus., Inc.*, 77 S.W.3d at 173 (noting that our state Supreme Court has expressed its agreement with the policy behind the doctrine), the acknowledgment of this point has done little to quell the parties' disagreements in this case. In fact, as alluded to previously, the specific controversy here concerns the economic loss doctrine's *scope*, namely whether it serves as a bar to fraud claims. To some degree, this dispute has been emboldened by virtue of the fact that various courts have taken different approaches to this precise question. Indeed, despite the widespread acceptance of the economic loss doctrine across the country, some courts have created exceptions for allegations of fraud. It appears that three approaches to fraud claims have emerged: (1) there is no exception to the economic loss doctrine; (2) there is a general exception for all fraud in the inducement claims; or (3) a narrow exception exists where the fraud "is not interwoven with the quality or character of the goods for which the parties contracted or otherwise involved performance of the contract." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 217 (Wis. 2005).

While we are not aware of any fraud exceptions to the economic loss doctrine under current Tennessee law, it is evident from the last of the three general approaches listed above, that even when those jurisdictions hold that fraud tort claims should not be categorically barred by the economic loss doctrine, such an "exception" is a limited one. As one court put it, "[t]he fraudulent inducement exception is subject to a widely recognized limitation that where the fraudulent misrepresentation concerns the quality, character, or safety of the goods sold, the economic loss doctrine bars the fraud claim because it is substantially redundant with warranty claims." *Flynn v. CTB, Inc.*, No. 1:12CV68 SNLJ, 2015 WL 5692299, at *12 (E.D. Mo. Sept. 28, 2015). Such a limitation on a fraud claim exception was notably adopted in the decision in *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541 (Mich. Ct. App.

1995), where the Michigan Court of Appeals held that a plaintiff could only pursue a claim for fraud in the inducement if it was "extraneous to the alleged breach of contract." *Id.* at 546. In applying this legal framework, the *Huron Tool* court stated as follows:

> [W]e must look to the four corners of plaintiff's complaint, accept all factual allegations as true, and determine whether the fraud claim falls outside the ambit of the economic loss doctrine. We hold that it does not. The fraudulent representations alleged by plaintiff concern the quality and characteristics of the software system sold by defendants. These representations are indistinguishable from the terms of the contract and warranty that plaintiff alleges were breached. Plaintiff fails to allege any wrongdoing by defendants independent of defendants' breach of contract and warranty. Because plaintiff's allegations of fraud are not extraneous to the contractual dispute, plaintiff is restricted to its contractual remedies under the UCC. The circuit court's dismissal of plaintiff's fraud claim was proper.

*Id.* (internal footnote omitted).

The Wisconsin Supreme Court's decision in *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205 (Wis. 2005), is another notable instance where such an analytical approach was adopted. In that case, the Wisconsin Supreme Court centered its focus, in part, on whether the alleged fraud "concerns matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted," explaining that misrepresentations that relate to the "quality or character of the goods sold" are either "(1) expressly dealt with in the contract's terms, or (2) if they are not dealt with explicitly in the contract's terms, they go to reasonable expectations of the parties to the risk of loss in the event the goods purchased did not meet the purchaser's expectations." *Id.* at 219. According to the *Kaloti* court, a fraud in the inducement claim would not be barred by the economic loss doctrine if the fraud was extraneous to the contract, rather than interwoven with it. *Id.*

While no Tennessee appellate court has found that an exception to the economic loss doctrine exists for extraneous fraud that is unrelated to the quality and character of the goods sold, we need not address it here because the claimed misrepresentations in this case clearly relate to the quality of the trucks purchased by Milan. Yet, like *Huron Tool*, *Kaloti*, and other decisions that have adopted such a narrow exception, we hold that where the alleged fraud, as in this case, relates to the quality of goods sold, the economic loss doctrine is a bar and any remedies must be pursued in contract/warranty law.

We find such an approach consistent with Tennessee law. This Court has noted that the economic loss doctrine draws the line between tort and warranty and, by quoting to other authority, has cautioned that courts "should be particularly skeptical of business

- 10 -

plaintiffs who—having negotiated an elaborate contract or having signed a form when they wish they had not—claim to have a right in tort." *Trinity Indus., Inc.*, 77 S.W.3d at 171–72 (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 10-5, 582–83 (4th ed. 1995)). Indeed, as discussed *supra*, the doctrine was created to avoid the "coming collision between warranty and contract on the one hand and the torts of strict liability, negligence, **fraud** and misrepresentation on the other." *Id.* at 171 (emphasis added) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 10-5, 580 (4th ed. 1995)). We have emphasized that the economic loss rule "requires parties to live by their contracts rather than to pursue tort actions for purely economic losses," *McLean*, 2005 WL 2493479, at *5, and in our view, because a purchaser's expectation interests regarding goods are protected by contract and warranty law, that law should govern grievances pertaining to the quality or character of the goods purchased. *See Milner v. Windward Petroleum, Inc.*, No. 06-2563, 2007 WL 9706514, at *6 (W.D. Tenn. May 31, 2007) (noting that "[m]any jurisdictions have held that fraud claims essentially alleging breach of contract are barred by the economic loss doctrine" and holding that the remedy lies in contract, not tort, where the alleged fraud pertains to the quality of the product).

We also take note of our Supreme Court's decision in *Mid-South Milling Co., Inc. v. Loret Farms, Inc.*, 521 S.W.2d 586 (Tenn. 1975). In that case, which concerned the purchase of poultry meal, the plaintiffs brought suit asserting several claims, including fraudulent misrepresentation and breach of express and implied warranties. *Id.* at 588. Among other things, the plaintiffs alleged that certain false representations had been made to them concerning the quality and character of the purchased poultry meal. *Id.* Despite the assertion of both tort and breach of warranty allegations, the Tennessee Supreme Court characterized the action as being under the Uniform Commercial Code:

> [T]he plaintiffs allege negligence, fraudulent misrepresentation, breach of express and implied warranties, and violation of T.C.A. Sec. 53–103. Regardless of the many allegations we must view the lawsuit in the light of what it really is—tort, breach of warranty of sale, or both.
>
> The plaintiffs allege certain representations were made to them concerning the quality and character of the poultry by-product meal. The plaintiffs claim they relied upon these representations which proved to be false, or were not carried out by the defendants. The plaintiffs further allege the defendants were negligent in mixing the poultry by-product meal and included therein certain ingredients which proved to be harmful to the plaintiff's chicks to the extent that the chicks did not make normal gains in weight. All of these allegations go to the real complaint—the defendants breached their warranty of sale.

- 11 -

> A contract may be negligently or fraudulently breached and the cause of action remain in contract rather than in tort.
>
> . . . .
>
> We . . . conclude the gravamen of the present cause of action is breach of warranty of sale, T.C.A. secs. 47–2–313 and 47–2–314; and the damages sought are permissible under and governed by T.C.A. secs. 47–2–714 and 47–2–715. The action lies under those provisions of the Uniform Commercial Code, even though tortious breach on the part of the defendants is alleged.

*Id.* at 588–89. Although *Mid-South Milling* was concerned with a question of venue and did not nominally invoke the "economic loss doctrine" or "economic loss rule," our state jurisprudence acknowledges that "the policies behind *Mid-South Milling* . . . are the same as those which inspired the economic loss doctrine." *Trinity Indus., Inc.*, 77 S.W.3d at 173.

To conclude with regard to this first issue, we are in general agreement with the arguments set forth by Navistar. Because only "economic loss" is at issue here and Milan's fraud claims concern the quality of the trucks sold to it, we hold that those claims are barred by the economic loss doctrine. Those claims are hereby dismissed.

*Milan's Tennessee Consumer Protection Act claim*

We next shift our attention to Milan's claim under the Tennessee Consumer Protection Act ("TCPA"). In its appellate brief, Navistar offers a couple of separate arguments as to why Milan's TCPA claim is without merit. Because we find its first articulated argument regarding the TCPA to be dispositive, we need not reach its second argument which concerns the statute of limitations.

Here, our focus is squarely concerned with the legal applicability of Tennessee Code Annotated section 47-18-104(b)(7) in light of the facts of this case. Indeed, per the Circuit Court's "Order of Judgment," the "jury found that Defendant, Navistar, did violate the Tennessee Consumer Protection Act, as codified at Tenn. Code Ann. § 47-18-104(b)(7)." (TR 8401) Pursuant to this statutory section, it is considered to be an unfair or deceptive act or practice if one represents that goods are of a "particular standard, quality or grade" or of a "particular style or model" if they are of another. Tenn. Code Ann. § 47-18-104(b)(7).

In this case, the jury specifically determined that Navistar had violated the TCPA by representing that purchased trucks were "of a particular standard, quality or grade, or that [they] were of a particular style or model, when they were that of another." Even

assuming this finding was unimpeachable, it does not support liability under Tennessee Code Annotated section 47-18-104(b)(7). The fundamental problem, as argued by Navistar, is that the purchased trucks here do not constitute "goods" for purposes of the TCPA. Under the statute, "goods" are defined to mean "any tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes or a franchise, distributorship agreement, or similar business opportunity." Tenn. Code Ann. § 47-18-103(7). As pointed out by Navistar in its appellate brief, the statute essentially provides two definitions for "goods." Indeed, as one decision has explained, the statute's definition "is in the disjunctive offering two categories of 'good'—a tangible chattel (with some qualifications) and a franchise, distributorship or similar business opportunity." *Pinkberry Ventures, Inc. v. Penninsular Grp., LLC*, Nos. CV13-02146 PSG(SSx), CV13-02662 PSG(SSx), 2014 WL 12600828, at *3 (C.D. Cal. Feb. 24, 2014).[2] Here, both categories of "goods" are inapplicable. Turning to the first categorical definition, we note the following: (1) the trucks were purchased by Milan, a logistics company, not an individual and (2) the trucks were purchased for use in Milan's business, not for personal, family, or household purposes. Based on these facts, the trucks are not "tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes." The second categorical definition of goods is also not satisfied, as the trucks at issue are clearly not a "franchise, distributorship agreement, or similar business opportunity."

Despite the argument advanced by Navistar on this issue, Milan urges this Court to deem the matter waived and suggests that Navistar's general motion for a directed verdict made during trial did not preserve this issue for appellate review. Respectfully, Milan's argument is without merit. Here, Navistar moved generally for a directed verdict, and as a previous panel of this Court has explained, "[a] general motion for a directed verdict made at the conclusion of the proof is sufficient to support a complaint on appeal that the evidence is legally insufficient to sustain the judgment." *Lewis v. Lawson*, C.A. Nos. 774, 775, 776, 1987 WL 26203, at *2 (Tenn. Ct. App. Dec. 8, 1987). Of course, as we have detailed herein, because the evidence surrounding the purchased trucks indicates that they are not a "good" within the meaning of the statute, the evidence is legally insufficient to support the specific TCPA violation claimed in this case.

Having concluded herein that the fraud and TCPA claims are without legal merit, it follows that the monetary judgments awarded against Navistar based on these claims cannot stand. We accordingly hereby reverse the monetary judgments entered in favor of Milan and conclude that the remaining issues raised by Navistar are pretermitted as unnecessary.[3]

---

[2] In *Pinkberry*, it was disputed whether the sale of a franchise involved a good. After consulting the "plain meaning interpretation of § 47-18-103(7)," it was held that the "sale of a franchise appears to come within the scope of the TCPA." *Pinkberry Ventures, Inc.*, 2014 WL 12600828, at *4.

[3] Although the remaining issues properly raised by Navistar are pretermitted as unnecessary, we are compelled to briefly address one other matter. Buried in a footnote in its appellate brief, Navistar

- 13 -

*Milan's Express Warranty Claims*

We next address Milan's contention that its breach of express warranty claims were erroneously dismissed. According to Milan, there are "triable issues" concerning whether Navistar's limited warranty failed its essential purpose. For the reasons that follow, we are of the opinion that Milan has waived its breach of warranty claims.

Considering that this case was tried by a jury and that Milan necessarily seeks a new trial on account of its warranty claims, Milan's request for relief is subject to the requirement in Rule 3(e) of the Tennessee Rules of Appellate Procedure. In relevant part, the plain text of that rule provides as follows: "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Here, Milan did not file a motion for new trial raising the issue connected to its express warranty claims.[4] As such, those issues are waived on appeal.

This Court reached an analogous result in its decision in *Nepp v. Hart*, No. M2005-2024-COA-R3-CV, 2006 WL 2582503 (Tenn. Ct. App. Sept. 7, 2006). In that case, the plaintiffs-homeowners filed suit in connection with a dispute over the construction of their residence. *Id.* at *1. Although a jury found in their favor on certain claims and awarded damages in an amount over $60,000.00, *id.* at *4, the plaintiffs-homeowners later appealed to this Court raising issues concerning prior interlocutory orders, including the previous dismissal of their TCPA claim. *Id.* at *5. Noting that the case had been tried to a jury, we explained that any ground upon which a new trial is sought must be raised in a motion for new trial:

> We do not reach the merits of the Homeowners' issues in this case because of procedural aspects. The issues raised by the Homeowners arise from the trial court's orders of September 30, 2003 and November 21, 2003. . . . [O]nce the final order in this case was entered on July 11, 2005, the Homeowners could raise any issues arising from the trial or any interlocutory orders so long as all procedural requirements were met. This

states that "this Court should award attorney's fees and expenses under the TCPA to Navistar." We deem this request to be waived, noting that it was not asserted in the "Statement of the Issues" section of Navistar's brief. *See Naylor v. Naylor*, No. W2016-00038-COA-R3-CV, 2016 WL 3923790, at *4 n.2 (Tenn. Ct. App. July 15, 2016) (noting that a request for attorney's fees was waived when not designated as an issue on appeal in the statement of the issues section of the party's appellate brief).

[4] In fact, we note that in a response to *Navistar's* motion for new trial, Milan actually made statements evidencing a distancing from its previously-asserted warranty claims, remarking (a) "there is no warranty claim in this case" and (b) "Navistar argues as if this were a warranty case governed by the UCC. This is a fraud case."

case was tried to a jury and, under Tenn. R. App. P. 3(e), the Homeowners were required to raise their issues first in a motion for new trial, to wit:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

> Having failed to call the trial court's attention, by way of a motion for new trial, to the alleged errors cited, the Homeowners have waived their right to be heard on those issues.

*Id.* at *5–6.

Because we deem Milan's issue waived in light of the requirement of Rule 3(e), we need not address Navistar's argument in defense of the Circuit Court's dismissal of the warranty claims. We now shift our attention to the remaining matters to be addressed, which concern whether Volunteer is entitled to attorney's fees under the TCPA.

### *Attorney's Fees Under the TCPA*

As previously discussed, a directed verdict was entered in favor of Volunteer following the conclusion of Milan's proof. As reasoning for this decision, the Circuit Court stated as follows:

> [T]he only testimony adduced regarding Volunteer International, Inc. in the Plaintiff's case-in-chief was presented through the testimony of John Ross, who testified the representative of Volunteer, to be an honest, credible man. Based on the requirement necessary to prove a . . . violation under the TCPA, the Court finds the Defendant Volunteer International, Inc.'s Motion for Directed Verdict should be granted.

In addition to granting a directed verdict, the Circuit Court subsequently concluded that Volunteer should also be awarded attorney's fees against Milan. Although Milan now seeks to have the Circuit Court's award of attorney's fees under the TCPA reversed, we decline to do so for the reasons stated below.

The relevant statutory provision at issue here is Tennessee Code Annotated section 47-18-109(e)(2). This section, which provides for an award of damages to TCPA

defendants, specifically states that "[i]n any private action commenced under this section, upon finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may require the person instituting the action to indemnify the defendant for any damages incurred, including reasonable attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(2). The decision regarding whether to award fees pursuant to this section is reviewed for an abuse of discretion. *Lapinsky v.Cook*, 536 S.W.3d 425, 446 (Tenn. Ct. App. 2016).

We cannot say that the trial court abused its discretion in awarding attorney's fees to Volunteer in this case, because as evidenced by the Circuit Court's order granting Volunteer a directed verdict, Milan's witness specifically testified favorably towards the honesty of Volunteer's representative. In fact, Milan's counsel candidly admitted before the Circuit Court that it had centered its proof on alleged activities of Navistar, not Volunteer. As Milan's counsel remarked, "[W]e just chose . . . as a matter of trial strategy, we were going to focus all of our evidence on Navistar."

Milan's central contention on appeal regarding this issue is that, because its TCPA claim survived a summary judgment motion, its claim was not "frivolous, without legal or factual merit, or brought for the purpose of harassment." In advancing a similar argument before the Circuit Court in a hearing on the fee issue, Milan's counsel argued as follows: "If we had no factual basis for the claim, you would have had to grant summary judgment. You denied summary judgment." The Circuit Court was unpersuaded and specifically noted that "the proof that was presented through your own witnesses . . . was in fact so favorable, it was all favorable about Volunteer." According to the Circuit Court, the "mere fact the claim survived the summary judgment does not absolutely demonstrate the claim had an actual factual basis, factual merit." Having reviewed this issue, we are in agreement with the Circuit Court and, as already noted, find no abuse of discretion on its part in awarding Volunteer fees. We therefore hereby affirm the Circuit Court's award of attorney's fees to Volunteer. We respectfully decline, however, to award Volunteer any attorney's fees in connection with this appeal.

## CONCLUSION

For the foregoing reasons, we reverse the judgment awarded to Milan and affirm the award of attorney's fees entered against Milan and in favor of Volunteer.

_____
ARNOLD B. GOLDIN, JUDGE

- 16 -